UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

PETER C. RIZZO,

                    Plaintiff,

       -vs-

CLOVER GROUP, INC.                                    Civil Case No. 23-406
348 Harris Hill Road
Buffalo, NY 14221                                     **COMPLAINT**

CLOVER MANAGEMENT, INC.                               **JURY TRIAL DEMANDED**
348 Harris Hill Road
Buffalo, NY 14221

CLOVER CONSTRUCTION MANAGEMENT,
INC.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER CONSTRUCTION MANAGEMENT
WEST CORP.
348 Harris Hill Road
Buffalo, NY 14221

THE CARLYLE GROUP
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

CARLYLE CLOVER PARTNERS, L.P.
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

CARLYLE CLOVER PARTNERS 2, L.P.
1001 Pennsylvania Avenue, NW, Ste. 220 S
Washington, DC 20004

WELLTOWER, INC.
4500 Dorr Street
Toledo, OH 43615

WELL IBIS PORTFOLIO MEMBER, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

WELLCLOVER VENUTRES, LLC
c/o Corporation Service Company
251 Little Falls Drive
Wilmington, DE 19808

WELLCLOVER HOLDINGS, LLC
c/o Corporation Service Company
80 State Street
Albany, NY 12207

CLOVER COMMUNITIES FUND I, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND II, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND III, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND IV, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND V, L.P.
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

CLOVER COMMUNITIES FUND V, LLC
c/o Clover Group, Inc.
348 Harris Hill Road
Buffalo, NY 14221

MICHAEL L. JOSEPH
3200 Washington Road
West Palm Beach, FL 33405

ALLISON H. JOSEPH PENDLETON
143 Windsor Avenue
Buffalo, NY 14209

RICHARD A. GREENSPAN
106 Ranch Trail West
Buffalo, NY 14221

ROBERT D. JACK
361 Reiber Road
Renfrew, PA 16053

EMILY BRADY
c/o Clover Management, Inc.
348 Harris Hill Road
Buffalo, NY 14221

                          Defendants.

## <u>INTRODUCTION</u>

1.       This is an action for injunctive relief, declaratory judgment, equitable relief, and damages filed by Plaintiff Peter C. Rizzo by and through his attorneys, Advocates for Justice, Chartered Attorneys, pursuant to the Fair Housing Act, 42 U.S.C. § 3617; U.S. Department of Housing and Urban Development ("HUD") regulations, 24 C.F.R. §§ 100.70(d)(1) and 100.400(c)(6); New York State Labor Law § 740(2); and New York State Executive Law § 296(7).

2.       As set forth in detail below, Defendants Clover Group, Inc.; Clover Management, Inc.; Clover Construction Management, Inc.; Clover Construction Management West Corp.; The Carlyle Group; Carlyle Clover Partners, L.P., Carlyle Clover Partners 2, L.P.; Welltower, Inc.; Well Ibis Portfolio Member, LLC.; WellClover Ventures, LLC; WellClover Holdings, LLC;

Clover Communities Fund I, L.P.; Clover Communities Fund II, L.P.; Clover Communities Fund III, L.P.; Clover Communities Fund IV, L.P.; Clover Communities Fund V, L.P.; Clover Communities Fund V, LLC; Michael Joseph; Allison Joseph Pendleton; Richard Greenspan; Robert Jack; and Emily Brady intentionally engaged in illegal race-based housing discrimination by refusing to develop housing in or near Black neighborhoods in violation of 42 U.S.C. § 3604(a), 24 C.F.R. § 100.70(b), and New York State Executive Law § 296(5)(a)(1); evidence of the same is inarguably documented in audio recordings.

## PARTIES

3.      Plaintiff Peter C. Rizzo resides in Buffalo, New York, and was employed as the Director of Development for Clover Construction Management, Inc. ("Clover Construction") from August 1, 2022, to January 27, 2023. Plaintiff performed work for Defendant Clover Construction, Defendant Clover Management, Inc. ("Clover Management"), and Defendant Clover Construction Management West Corp. ("Clover West").

4.      Defendant Clover Group Inc. ("Clover Group") is a domestic corporation organized and existing under the laws of the State of New York that owns and manages market-rate age-restricted multi-family rental housing in New York, Pennsylvania, Indiana, Ohio, Kentucky, and Missouri.

5.      Defendant Clover Management is a domestic corporation organized and existing under the laws of the State of New York that manages leasing and operations of market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221.

6.      Defendant Clover Construction is a domestic corporation organized and existing under the laws of the State of New York that specializes in the development and construction of

4

market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221.

7.      Defendant Clover West is a foreign corporation organized and existing under the laws of the state of Delaware specializing in the development and construction of market-rate age-restricted multi-family rental housing, with headquarters at 348 Harris Hill Road, Buffalo, New York 14221 (collectively referred to with Clover Group, Clover Management, and Clover Construction as the "Clover Entities").

8.      Defendant The Carlyle Group ("Carlyle") is a global private equity firm with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Carlyle partners with Clover Entities on developing Clover Entities' market-rate age-restricted multi-family rental housing and has decision-making authority over Clover Entities' site selection decisions. Defendant Carlyle is an owner of Carlyle Clover Partners, L.P., and Carlyle Clover Partners 2, L.P.

9.      Defendant Carlyle Clover Partners, L.P. ("Carlyle Clover") is a foreign entity organized and existing under the laws of the Cayman Islands with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Upon information and belief, Carlyle Clover has an ownership interest in Clover Entities.

10.     Defendant Carlyle Clover Partners 2, L.P. ("Carlyle Clover 2" and collectively with Defendant Carlyle and Defendant Carlyle Clover, as "Carlyle Defendant")) is a foreign entity organized and existing under the laws of the Cayman Islands with headquarters at 1001 Pennsylvania Avenue, Ste. 220 S, Washington, D.C. 20004. Upon information and belief, Carlyle Clover 2 has an ownership interest in Clover Entities.

11.     Defendant Welltower, Inc. ("Welltower"), a Real Estate Investment Trust (REIT), is a publicly traded company organized and existing under the laws of the state of Delaware with its headquarters in Toledo, Ohio. It is a foreign corporation registered to do business in the state of New York. Defendant Welltower is traded on the New York Stock Exchange. Defendant Welltower is an owner of Well Ibis Portfolio Member, LLC, a Delaware limited liability company.

12.     Defendant Well Ibis Portfolio Member, LLC ("Well Ibis"), along with Clover Entities, is an owner of Defendant WellClover Ventures, LLC.

13.     Defendant WellClover Ventures, LLC ("WellClover Ventures") is a Delaware Limited Liability Company that is not registered to do business in New York State. Defendant WellClover Ventures, upon information and belief, is an owner of WellClover Holdings, LLC.

14.     Defendant WellClover Holdings, LLC ("WellClover Holdings" and together with Defendant Welltower, Defendant Well Ibis, and Defendant WellClover Ventures, as "Welltower Defendants") is a limited liability company organized and existing under the laws of the state of Delaware with its headquarters in Toledo, Ohio. It is a foreign entity registered to do business in the state of New York. Defendant WellClover Holdings, upon information and belief, has an ownership interest in Clover Entities.

15.     Defendant Clover Communities Fund I, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

16.     Defendant Clover Communities Fund II, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an

ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

17.     Defendant Clover Communities Fund III, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

18.     Defendant Clover Communities Fund IV, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

19.     Defendant Clover Communities Fund V, L.P. is a limited partnership organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments.

20.     Defendant Clover Communities Fund V, LLC is a limited liability company organized and existing under the laws of the state of Delaware. Upon information and belief, it has an ownership interest in Clover Entities through investments in Clover Entities' market-rate age-restricted multi-family rental housing developments. Defendant Clover Communities Fund V, LLC is referred to collectively with Defendant Clover Communities Fund I, L.P., Defendant Clover Communities Fund II, L.P., Defendant Clover Communities Fund III, L.P., Defendant Clover Communities Fund IV, L.P., and Defendant Clover Communities Fund V, L.P. as "Clover Community Funds")

21.    Defendant Michael Joseph resides in West Palm Beach, Florida, and is an owner and President of Clover Entities.

22.    Defendant Allison Joseph Pendleton resides in Buffalo, New York, and is the Chief Operating Officer of Clover Entities.

23.    Defendant Richard Greenspan resides in Buffalo, New York, and is the Vice President of Clover Entities.

24.    Defendant Robert Jack resides in Renfrew, Pennsylvania, and is Executive Vice President of Development for Clover Entities and was Plaintiff's direct supervisor.

25.    Defendant Emily Brady resides, upon information and belief, in Buffalo, New York, and is Vice President of Operations for Clover Entities.

## JURISDICTION AND VENUE

26.    Jurisdiction over Plaintiff's claims is conferred upon this Court by 28 U.S.C. § 1331 in that this action arises under the laws of the United States.

27.    Venue is proper in the United States District Court, Western District of New York, pursuant to 28 U.S.C. § 1391(b) because Defendants have and continue to conduct business in the Western District of New York.

## STATEMENT OF FACTS

### A.    PLAINTIFF'S BACKGROUND AND HOW HE CAME TO BE EMPLOYED BY CLOVER ENTITIES

28.    Defendant Clover Entities are owned and operated by Defendant Joseph, who has purchased and developed more than 700 million dollars in residential and commercial properties since 1989. Since approximately the year 2000, Defendant Clover Entities have built their business around developing and operating market-rate age-restricted apartment buildings. Clover Entities' properties are marketed as affordable senior living apartment communities.

8

29.    Today, Defendant Clover Entities owns and manages dozens of such properties in New York and five other states.

30.    Plaintiff is a 38-year-old husband and father who grew up in Western New York. He is a graduate of the University at Buffalo and Cornell University and holds professional certifications from the American Institute of Certified Planners, the Association of Certified Fraud Examiners, and the Institute of Internal Auditors.

31.    In May 2022, Plaintiff received an unsolicited inquiry from a staffing recruiter for a job with Defendant Clover Entities as Director of Development.

32.    On June 9, 2022, Plaintiff accepted an offer of employment from Defendant Clover Entities, and commenced employment on August 1, 2022, as the Director of Development for Clover Construction.

## B.    PLAINTIFF'S RESPONSIBILITIES AT CLOVER ENTITIES

33.    As one of his first tasks for Defendant Clover Entities, Plaintiff developed a fully integrated online development project management platform that included a site submission and approval portal for prospective development sites, a project tracking and recordkeeping interface, and a project schedule tool.

34.    Using the site submission portal, Defendant Clover Entities' employees enter and upload information regarding prospective development sites—including a given site's address, size (in acres), seller's asking price, name of seller's broker, surrounding demographic data, comparable apartment rental rates, and other details—for review.

35.    The prospective sites are then vetted by Defendant Jack and Defendant Greenspan.

36.    Plaintiff also drafted a revision of the *Clover Development Handbook*—a policies and procedures manual for Defendant Clover Entities to close significant internal control gaps (i.e., areas of business operations for which Defendant Clover Entities had no policies or procedures in place), and to formalize the company's development operations for consistency and efficiency.

37.    Plaintiff took over management responsibilities for five separate development projects that were at various stages of completion.

38.    As part of his management responsibilities, Plaintiff searched for potential development sites and generated demographics reports for each prospective site that included U.S. Census Bureau population data for the area surrounding a given property.

39.    As stated previously, every prospective development site submitted to Clover Entities' leadership for approval needed to include a demographics report that identifies the race of persons living near the subject property.

40.    In addition to Defendants Greenspan and Jack, the Carlyle Defendants, the Welltower Defendants and Defendants Clover Community Funds vetted and approved selection of all development sites.

## C.    CLOVER ENTITIES' ILLEGAL RACE-BASED HOUSING DISCRIMINATION PRACTICES

41.    Plaintiff quickly discovered that Defendant Clover Entities require inclusion of racial demographics with each proposed development site because Defendant Clover Entities illegally reject potential development sites in or even near Black neighborhoods.

42.    Defendant Clover Entities use a set of *written* and *unwritten* site selection criteria to find land deemed suitable for the firm's residential development projects.

43.     Defendant Clover Entities' *written* site selection criteria are lawful and appropriate measures for a company that builds market-rate age-restricted apartment buildings. For example, Defendant Clover Entities required prospective development sites to be of a certain minimum size (total acreage). They also required minimum thresholds for certain demographics data for populations living within, and properties located within, radiuses of three, five, and/or 10 miles from prospective development sites; these included the number of persons aged 65 and older, the average household income, and the median home value.

44.     Defendant Clover Entities' unwritten site selection criteria are illegal and rely upon the percentage of Black people living within both a three-mile radius and a five-mile radius of a prospective development site to determine whether the site is suitable for Clover Entities' purposes.

45.     Defendant Clover Entities' executives and employees referred to Black people by the derogatory term, "Canadians."[1]

46.     Defendant Clover Entities' executives referred to the unwritten site selection criteria concerning the percentage of Black people living within both a three-mile radius and a five-mile radius of a prospective development site as the "Canadian Factor," and regularly rejected development of prospective sites when the reported Black population percentages were at or near 20 percent.

47.     Defendant Greenspan explained, when describing the unwritten policy, that Defendant Clover Entities will not develop its market-rate age-restricted apartment buildings in "heavily Black areas."

---

[1] "Canadian," as used by the Clover Entities, is a euphemism for "n*gger."

48.     In fact, among Defendant Clover Entities' 48 market-rate age-restricted apartment buildings in operation as of this filing, the average percentage of Black people living within a three-mile radius of these properties is just 6.77%, which is less than half the national Black population percentage (13.6%).

49.     Defendant Clover Entities' race-based site selection criteria are often the most important selection criteria for Defendant Clover Entities' executives. Specifically, the "Canadian Factor" is the key metric for Defendant Greenspan and Defendant Jack, as well as other development staff.

50.     On many occasions in Defendant Greenspan's office, Plaintiff directly observed Defendant Greenspan perform reviews of prospective development sites. In each such event, Plaintiff saw Defendant Greenspan review "Population By Race," as the first relevant metric, and the only one reviewed if it was too high.

51.     During such reviews, Defendant Greenspan commented to Plaintiff about the number of "Canadians" or "shvartzes," (a Yiddish racial slur) living within the three-mile radius and five-mile radius of the subject property.

52.     For example, on one occasion when Plaintiff met with Defendant Greenspan to review a proposed development site, Defendant Greenspan gestured to the Black population percentage on the demographics report, "I don't like that." When Plaintiff asked Defendant Greenspan to clarify what "that" was, Defendant Greenspan stated in response, "Canadians."

53.     Other members of Defendant Clover Entities' leadership also openly expressed concern, and even laughed about, the "Canadian Factor."

54.     Defendant Clover Entities' Executive Vice President of Development Defendant Jack, and Defendant Clover Entities' Land Acquisition Manager Russell Caplin, were both aware of the policy race-based exclusion policy, and both complied with the policy.

55.     In fact, when Plaintiff questioned Defendant Jack about the policy, he nervously directed Plaintiff to take his question to Defendant Greenspan. In the same conversation, Caplin expressed concern by stating, "Let's hope we never get deposed on that."

56.     To find out exactly how Black people affect Clover Entities' "leasing," as Defendant Jack stated, Plaintiff turned to Defendant Clover Entities' Executive Vice President of Operations, Defendant Emily Brady, who is responsible for Defendant Clover Entities' leasing operations nationwide. Defendant Brady did not deny the policy, but attempted to justify it by suggesting that the Black community has "a lot of trouble paying their rent." Defendant Brady then justified Clover Entities' discriminatory site selection criteria and practices by explaining that Defendant Greenspan "d[id]n't want to put [Defendant Joseph] in that position where he chooses land that's in an urban area that may have some type of issue with residents paying their rent."

57.     The Carlyle Defendants, the Welltower Defendants and Defendants Clover Community Funds were provided demographic data for prospective sites and, upon information and belief, were aware, or should have been aware, that Defendant Clover Entities illegally relied upon race as a factor in rejecting sites for development.

58.     The Carlyle Defendants, the Welltower Defendants and Defendants Clover Community Funds actively participated in review of each proposed development site, and vetted and approved each site before selection or rejection.

D.    **PLAINTIFF REPORTED CLOVER ENTITIES' ILLEGAL SITE SELECTION PRACTICES TO EXECUTIVE LEADERSHIP**

59.    Plaintiff knew Defendant Clover Entities' race-based discriminatory site selection criteria and practices were illegal under federal and state laws and that these illegal activities represented a liability for all Defendants, particularly Defendant Joseph, Chair of the Board of Directors of Roswell Park Comprehensive Cancer Center and on the Board of Directors of the Buffalo AKG Art Museum, in addition to being among the highest campaign donors to New York Governor Kathy Hochul. Plaintiff also knew that as a member of Defendant Clover Entities' leadership team, he had a fiduciary duty to act in Clover Entities' best interest.

60.    Plaintiff thus took necessary and appropriate steps to resolve this liability by reporting the illegal policy to three Defendant Clover Entities' executives and by recommending the implementation of an anti-discrimination site selection policy.

61.    In or about January 2023, Plaintiff discussed the specifics of Defendant Clover Entities' race-based discriminatory site selection criteria and practices with Defendant Brady. Defendant Brady confirmed that the race-based selection policy was "a violation of the Fair Housing Act."

62.    Plaintiff also discussed the specifics of Defendant Clover Entities' race-based discriminatory site selection criteria and practices, and Defendant Clover Entities' violation of the Fair Housing Act, with Defendant Joseph Pendleton, daughter of Defendant Joseph.

63.    In order to remediate the discriminatory policy, Plaintiff drafted an anti-discrimination site selection policy (the "Antidiscrimination Policy") for Defendant Joseph Pendelton to review and implement. The Antidiscrimination Policy was crafted to prevent illegal, discriminatory site selection criteria and practices at Defendant Clover Entities. Plaintiff was hopeful that it would result in selection of development sites in racially diverse areas.

64.     Plaintiff emailed the Antidiscrimination Policy to Defendant Joseph Pendelton for her review.

65.     Defendant Joseph Pendelton did not take any action to remedy the reported violation of the Fair Housing Act.

66.     Plaintiff informed his direct supervisor, Defendant Jack, about his conversation with Defendant Joseph Pendleton regarding Defendant Clover Entities' discriminatory site selection policy and reported to Defendant Jack that these activities are illegal under the Fair Housing Act.

67.     Defendant Jack responded angrily, stating that he was "pissed" that Plaintiff had spoken to Defendant Joseph Pendleton about Defendant Clover Entities' illegal discrimination instead of first discussing the matter with Defendant Jack.

68.     Defendant Jack later instructed Plaintiff to report "these types of concerns" directly to Defendant Jack.

69.     A few days later, Defendant Joseph Pendleton provided the Antidiscrimination Policy drafted by Plaintiff to Defendant Jack for his records. Defendant Joseph Pendleton and Defendant Jack later discussed the Antidiscrimination Policy and, in sham support of said policy, mutually agreed to have Plaintiff add it to the draft Clover Development Handbook. Defendant Jack subsequently instructed Plaintiff to do the same.

70.     The Clover Development Handbook was at that time, and remains upon information and belief, in draft form.

71.     Neither Defendant Jack nor Defendant Joseph Pendleton provided the Antidiscrimination Policy to Defendant Clover Entities' employees, nor did they train Defendant

Clover Entities' employees on the Antidiscrimination Policy, nor take any steps to implement the policy.

72.     In the words of Defendant Jack, he and Defendant Joseph Pendleton "just want[ed] [the Antidiscrimination Policy] in the draft handbook" to "make sure [to] have something memorialized."

**E.     PLAINTIFF REFUSED TO PARTICIPATE IN CLOVER ENTITIES' ILLEGAL SITE SELECTION PRACTICES**

73.     On January 5, 2023, when Plaintiff reported Defendant Clover Entities' illegal site selection criteria and practices to Defendant Joseph Pendleton, Plaintiff also told Defendant Joseph Pendleton, "I don't want to be the Director of Development of a company that is actively discriminating."

74.     Through this statement, Plaintiff expressed his refusal to participate in Defendant Clover Entities' illegal housing practices.

75.     Additionally, Plaintiff sought to remedy the illegal policy and practice by proposing to Defendant Clover Entities' leadership a prospective market-rate age-restricted multi-family rental housing development site on Piscataway Road in Clinton, Maryland, which was priced at less than half of what Defendant Clover Entities has agreed to pay in other locations and featured metrics that well exceeded all of Defendant Clover Entities' written site selection criteria. However, the Black population is 80.68% within a three-mile radius of this property and 76.62% within a five-mile radius of this property.

76.     Defendant Jack electronically approved the site Plaintiff proposed in Clinton, Maryland.

77.     However, Defendant Jack subsequently told Plaintiff that the site would no longer be considered for development by Defendant Clover Entities.

78.     According to Defendant Jack, Defendant Clover Entities changed its development strategy effective immediately to focus only on new properties within metropolitan areas where Defendant Clover Entities already owns property or has a property under contract.

79.     This new policy effectively ensured that Defendant Clover Entities would only develop property in areas that Defendant Clover Entities' executives already vetted and determined to have sufficiently low Black populations to satisfy Defendant Clover Entities' racist policy for site selection.

80.     The purpose of this new policy, upon information and belief, is to circumnavigate fair housing laws and provide a seemingly legitimate but pretextual reason to reject development sites in areas where the Black population exceeds Defendant Clover Entities' comfort level.

## F.     CLOVER ENTITIES RETALIATED AGAINST PLAINTIFF FOR REPORTING ITS DISCRIMINATORY HOUSING PRACTICES AND FOR REFUSING TO PARTICIPATE IN SUCH ACTIVITY

81.     Plaintiff risked his livelihood and professional reputation to do the right thing by (1) reporting Defendant Clover Entities' illegal race-based housing discrimination to company executives, and (2) refusing to participate in Defendant Clover Entities' illegal housing practices.

82.     In exchange, Defendant Clover Entities fired him in a blatant and illegal act of retaliation.

83.     Plaintiff's termination occurred on Friday, January 27, 2023—just 22 days after Plaintiff reported Defendant Clover Entities' illegal race-based housing discrimination to their own Chief Operating Officer, Defendant Joseph Pendelton, and only seven days after Plaintiff refused to engage in Defendant Clover Entities' illegal race-based housing discrimination by submitting the Clinton, Maryland, site for development.

84.    Plaintiff was terminated over the phone by Defendant Jack, who told Plaintiff that his termination was exclusively for *financial reasons* because "the financial situation of Clover is not good."

85.    The claim that the Clover Entities' financial situation is "not good," is pretextual and meant to justify Plaintiff's retaliatory termination.

86.    Indeed:

a.    Defendant Clover Entities have a secure revenue stream from their rental properties and are financially backed by Defendant Carlyle.

b.    At the time Plaintiff was hired, Defendant Clover Entities' executives boasted about the companies' strength and financial power, and how Defendant Clover Entities have repeatedly proven to be recession-proof because the demand for Defendant Clover Entities' niche market-rate age-restricted multi-family rental housing product is strong and growing by the day.

c.    Defendant Joseph often circulated published articles among Defendant Clover Entities' employees that detail the strength of the market-rate age-restricted multi-family rental housing demand in the United States.

d.    Defendant Clover Construction Management, Plaintiff's employer of record, hired two (2) new employees just days before Plaintiff was terminated.

e.    Plaintiff remains the only development employee laid off by Defendant Clover Entities since Defendant Jack first alleged Clover Entities' financial situation is "not good."

f.    Defendant Clover Entities' website indicates that it "continues to grow" and encourages visitors to submit their resumes for employment consideration.

g.      Defendant Clover Entities' executives represented to Plaintiff that the Director of Development position is an essential role, especially in that it is Defendant Clover Entities' only full-time non-administrative real estate development job in the company's Buffalo headquarters office.

h.      Additionally, Plaintiff was terminated without notice at the end of a work week, affording Plaintiff no time or opportunity to transition his substantial workload to his colleagues, or train his colleagues on how to manage the backend of the new fully integrated online development project management platform Plaintiff had built for Defendant Clover Entities.

i.      Defendant Clover Entities' executives expressed to Plaintiff they were *"pissed,"* that Plaintiff reported the racist and illegal housing discrimination practices.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### Retaliation in Violation of the Fair Housing Act

87.     Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

88.     Plaintiff was an employee of Defendants.

89.     Plaintiff identified that Defendants' market-rate age-restricted multi-family rental housing developments were dependent on discriminatory race-based site selection criteria and practices that violate the law, specifically, 42 U.S.C. § 3604(a), 24 C.F.R. § 100.70.

90.     Plaintiff made legally protected disclosures when he reported to Defendants that their discriminatory race-based site selection criteria and practices were illegal and needed to change.

91.     Defendants expressed anger and animus toward Plaintiff for his protected disclosures.

92.     Plaintiff also refused to participate in Defendants' discriminatory race-based site selection practices.

93.     Defendants expressed anger and animus toward Plaintiff for his refusal to participate in Defendants' discriminatory race-based site selection practices by recommending the development of a site that did not comply with Defendants' discriminatory race-based site criteria.

94.     Defendants terminated Plaintiff's employment because of Plaintiff's protected disclosures and because of Plaintiff's refusal to participate in Defendants' discriminatory race-based site selection process.

95.     As a result of Defendants' willful and unlawful conduct in violation of 42 U.S.C. § 3617; 24 C.F.R. § 100.70(d)(1); and 24 C.F.R. § 100.400(c)(6); Plaintiff suffered grievous, extensive, and continuing damages, including but not limited to humiliation, embarrassment, reputational harm, lost wages, lost benefits, liquidated damages, attorneys' fees, and the costs of this action.

## SECOND CLAIM FOR RELIEF
### Retaliation in Violation of the New York Human Rights Law

96.     Plaintiff hereby re-alleges and hereby incorporates by reference each and every allegation set forth in the foregoing paragraphs as if fully set forth herein.

97.     Plaintiff was an employee of Defendants.

98.     Plaintiff identified that Defendants' market-rate age-restricted multi-family rental housing developments were dependent on discriminatory race-based site selection criteria and

practices that violate the law, specifically New York State Human Rights Law (Executive Law § 296).

99.     Plaintiff made legally protected disclosures when he reported to Defendants that their discriminatory race-based site selection criteria and practices were illegal and needed to change.

100.     Defendants expressed anger and animus toward Plaintiff for his protected disclosures.

101.     Plaintiff also refused to participate in Defendants' discriminatory race-based site selection practices.

102.     Defendants expressed anger and animus toward Plaintiff for his refusal to participate in Defendants' discriminatory race-based site selection practices by recommending the development of a site that did not comply with Defendants' discriminatory race-based site criteria.

103.     Defendants terminated Plaintiff's employment because of Plaintiff's protected disclosures and because of Plaintiff's refusal to participate in Defendants' discriminatory race-based site selection process.

104.     As a result of Defendants' willful and unlawful conduct in violation of New York State Executive Law § 296(7), Plaintiff suffered grievous, extensive, and continuing damages, including but not limited to humiliation, embarrassment, reputational harm, lost wages, lost benefits, liquidated damages, attorneys' fees, and the costs of this action.

## THIRD CLAIM FOR RELIEF

### Discrimination

105.    Defendants' race-based site selection criteria and practices that prevented Defendants from developing market-rate age-restricted multi-family rental housing in or near Black neighborhoods expressly violate the Fair Housing Act, 42 U.S.C. § 3604(a).

106.    The Fair Housing Act provides that "if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages," 42 U.S.C. § 3613(c)(1) (emphasis added).

107.    By its text, the Fair Housing Act authorizes punitive damages against all Defendants.

108.    As a result of Defendants' willful and unlawful conduct in violation of 42 U.S.C. § 3604(a), Plaintiff is authorized to receive punitive damages.

## REQUEST FOR ATTORNEY AND EXPERT FEES AND COSTS

109.    If Plaintiff prevails, he is entitled to an award of attorney and expert fees and costs.

## DEMAND FOR TRIAL BY JURY

110.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that this Court will grant his judgment containing the following relief:

A.    Declare the aforementioned actions of Defendants to be in violation of federal and state statutes and regulations;

22

B.      Grant Plaintiff an amount to be determined at trial, in no event less than

$15,000,000.00, for back pay and front pay lost benefits, pain and suffering, and punitive

damages;

C.      Impanel a jury to hear Plaintiff's claims;

D.      Costs and disbursements of this action, including attorney fees; and

E.      Such other and further relief as this Court deems necessary and proper.

Dated: May 8, 2023

Respectfully Submitted,

/s/  *Nathan D. McMurray*
Nathan D. McMurray
ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
225 Broadway, Suite 225
New York, New York 10007
Phone: (212) 285-1400
Cell: (716) 517-5506
nmcmurray@advocatesny.com